Okay, our next case for argument is appeal number 233065, the United States v. Olivia Spellman. Mr. Bugney, nice to see you. Good to see you, Your Honors. May it please the Court, my name is Joe Bugney. I'm here on behalf of Ms. Spellman. As we all know in this courtroom, federal sentencing is usually, and almost universally, the worst day in a person's life. The nerves are high, there's a lot at stake, everybody's prepared, and they've talked with their counsel, they've made strategic decisions about what they want to do, what they don't want to do, everybody's set. In this case, Ms. Spellman said, I don't want to talk. I don't want to talk. And that's what her lawyer agreed with, said, we're not going to speak. That's a strategic decision that she walked in there knowing what she was going to do. The judge, now she says it inartfully, says I declined to speak, you know, but we all know what she's saying. Judge clarifies. Sorry, what did you say? I have. I just want you to acknowledge, you know, that you knew what was wrong and apologize to the victims. That's one step too far. The first push through to clarify, fine, I didn't really hear what you said. The second one to know that, you know, your client, you've talked with your lawyer, maybe that's pushing the envelope. I think it is pushing the envelope, you should have moved on. But once you go and start asking her specific questions, she can only cower beneath the power that she's facing at that moment. So here's your argument's clear. I mean, you wrote a good brief, as you always do. Here's my here's my question. What rule do you want us to announce? I thought about that. The opinion you want to write, I think you should write is here. The judge just had to respect the opinion. No different than if it was a police officer, the invocation. As soon as the client or the defendant invokes, just set it down, just put it now. We move to sentencing, impose sentencing. That's the clear rule. And the fact that we neither of us, when does the Fifth Amendment violation, I don't want to get too deep. When did it occur? So if you mean when is it an incriminating statement? I think you could look at that in two ways. One, you could look at like the atmospheric where you'd say like her lack of remorse, et cetera. If you look at where she actually exposed herself to criminal liability, which is truly what we look for a Fifth Amendment violation, then we would say it's when she starts talking about Divine Kruger and how long she's known him and the fact that there were other frauds. Wasn't all of that information already before? No. Sorry to cut you off. It's fine. I get it a lot. Well, not for me, I hope. But no, so not all that information was there. The PSR in paragraph 17 and 18, they're very clear. It's this mail fraud aspect of it. And then the judge says, hey, I just want to ask you a few questions and gets into what else she was doing. Well, I met him doing these Facebook scams. And she doesn't use the word scam, but it's very clear you don't go from honest dealings over Facebook with this guy in Asia to then doing fraudulent. No, this was showing something else. It was also showing how prolonged it was. This wasn't just a very short operation. So you have from March, I believe, is the first. But I thought the judge did before he began, gone down this line of questioning, said, hey, I understand what the recommendation is. Definitely going to go below the guidelines, but because of the longer term relationship of Ms. Spellman with this individual overseas, maybe not as low as you want it to go. I think it's not to the length, but so much to the money gain because it's at $450,000. So he's look, this is all part of these PPP or not PPP, but COVID related frauds. I haven't seen anybody that high yet, but this is what I'm looking at. It wasn't really to the length of, and I put it this way, as a defense lawyer, you never want to have the second fraud. Like the first one, you're like, hey, I'm really sorry. And whoa, that got out of control. Here we have, oh no, no, there's been more activity. You've actually been a liar for a lot longer. And it allows for the judge to say, look, I don't really like this joint recommendation. Not everything that you've told me is in the PSR, which is always a problem. But this sentence, one of the comments that Judge Connolly made at the outset of sentencing, and correct me if I'm mistaken about this, was he said, I get it. You've all recommended 14 months. I'm not bound by the 14 months. I'm not sure that I'm going to do 14 months. I might have to bump it up a little bit. And then everything kind of went from there. So he wouldn't have made that statement if there wasn't something concerning to him about the inadequacy of the joint recommendation of the parties. I mean, how else do you explain it, right? So something's on his mind. Some judges are sometimes contrarian. Like 14 months is not good enough. 14 months in one day. But I think when you look at the reasons, it's got to be the points that Judge Pryor was observing and that takes me back to how is anything that she said in response to the question the least bit incriminating? Well, it goes to the second fraud, to the Facebook aspect of it. And the fact that he says, I might not go with 15, doesn't say that after hearing whatever else you might want to hear, he says, okay, actually 14 is fine or 15 is fine. And that's why the constitutional error is, are you convinced beyond a reasonable doubt that this would have been 16 months? So step back from this a little bit. Let's go back to the rule point. So suppose, for example, hypothetically, a defendant, for whatever reason, does not give basic pedigree information to a probation officer in a PSR interview. They just won't. They won't give a true birth date. They won't give addresses. They won't give information about family, etc. And the judge says, look, you need to cut it out. I've got some basic questions for you. What's your birthday? What's your last known address? Okay. Fifth Amendment violation? It actually is. And so there's a great case by Edward Bennett Williams back in DC. It depends on what it's connected to. And so can you have the connection that like, look, I'm actually, I have a fraudulent ID, or like, I'm actually here illegally. And all of this is, and it would expose me to that, then yes, that's a Fifth Amendment, something that he can protect, that the defendant can protect. The pedigree information, if it would lead to criminal charges, is all something that the person can shield. It's not that we look at it and we can make those fine slices. It's why we usually have, when a person invokes it, a grand jury. So is your, so the rule is what's throwing me off. So is your position that a criminal defendant can say, judge, I want to be very clear with you. You can ask me questions all day long. I'm not answering one of them. I think that. It doesn't matter. You can ask me whatever you want. I'm not answering any of them. And the judge says, why is that? Fifth Amendment. Yeah. I think that's a great rule. That's actually the. I mean, but that upends, I mean, that completely upends everything the Supreme Court's told us. It's got to be incriminating. But if the client knows, and he's talked to his lawyer, and they say, look, this is the path that it could be led on, then we know that it could be incriminating. We say like, look, I have so much more criminal activity out there and I can't even give you my real name. I can't give him my birthday because then you'll see that I've actually stolen somebody else's. I want to know what jail you're currently housed in. I'm not answering that question. Now he's becoming obstructionist and he's probably going to get hammered for a thousand other reasons, but. I just don't see how the Fifth Amendment, I'm trying to get at the rule. I can't understand. What's the parameters of the rule? I think to the jail you're being housed at, I think you'd be held in contempt. If that was, if you had a grand jury. Forget that. Fifth Amendment. Focus on the Fifth Amendment. Yeah. Is there something that you're tying it to that it would be incriminating? So if you were to say, look, I'll just give you your instance. All right. You know, I was at Cook County Jail and I shanked somebody. And like, you know, they don't know if I was really there on that day. And they're like, what was the last jail you were at, Buckneat? Well, I mean, I'm not going to say I was ever at Cook County Jail. I don't want to acknowledge I was ever at Cook County Jail. I don't want to acknowledge anything about that. I want to go back to the facts of this case. Compelling, compelled, and incriminating. Yep. Right. What new information did Ms. Spellman give as a result of the questions? If we accept that the judge kept asking her questions after she said, I don't want to talk. Okay. What incriminating statements? So it would be the bottom of page 10 going into 11 of the appendix where she talks about where she met Divine Kruger and the fact that there was this rental of things on Facebook. Craigslist. Craigslist. Craigslist Facebook. All right. That's not contained in the PSR. You can look at paragraphs 17 and 18 of the PSR. Is it in the sentencing memorandum? No. No. So that's the incriminating information. It's not an innocuous statement. It's revealing more about what she did with Divine Kruger than what's in the PSR and also what she had given in her original statement to law enforcement. That's incriminating. All it is is an explanation of how they committed the crime. No. No. It's a different crime. So if you read it as it goes on, it's, hey, I met him with doing this, helping get people's identification, you know, and renting apartments. Now that's completely different from the crime. The crime itself was him taking people's IDs or their information and signing them up for unemployment benefits. That's a completely different aspect of it. Now a natural reading of that would be you're actually using these Facebook, you know, to rent stuff to steal people's identifications and also to be part of that. So it is a different crime. It is incriminating. So, Your Honor, I think you can look at the Gamble case and say, look, the idea of the invocation is going to be the same, right, at sentencing as it would be in any other endeavor. And that's the clear lines that you draw. Now, so long as I, as the defense attorney, after consulting with my client can say, look, here's where the Fifth Amendment lies, and this is why it could be incriminating. A lot of things are covered. A lot of areas are covered. They may seem innocuous, but they are what trip people up. And it's why we do have the Fifth Amendment, because we let them shield that. And once we started looking past that, we don't say the bright line. In this individual case, just send it back for a remand. There's no reason to try to make hash of this area of the law to say you asked too many questions, she clearly invoked, and the remedy for that is to let the judge make a decision. But there has to be incriminating statements made. And those incriminating statements were made. I think once you have fraud beyond what the fraud that's contained in the PSR, I think that's incriminating. Now, a good detective— What was fraudulent about posting rental agreements or rental property on Craigslist? Well, it's showing that a longer relationship with Divine Kruger, but also I think the fair implication of that is, look, I was involved far more than what's been there. Now, the incriminating nature of it is not spelled out. The judge didn't go, well, were these all fraudulent? But you kind of know that somebody from Asia who's only being paid in Bitcoin, where you've only done all this, the clear implication is that's actually fraud. That's another aspect of this fraudulent relationship. So it's not the case where everything that was elicited was innocuous or it was just biographical. All you're saying is it's painting her in a worse light. Exactly. All right. Let's hear from the government. We'll give you a minute on rebuttal. All right. Yep. Ms. Remington, good morning. Good morning, Your Honors. May it please the court. I'm Jennifer Remington, and I represent the government. The parties disagree on the standard review here. And so I'd like to start by talking about that and also about why Ms. Feldman did not unambiguously invoke her right to remain silent. But based on the last minute of questioning that the court just engaged with in imposing counsel, I want to start officially by clarifying what I see as a big misunderstanding of the record in this case. And the relationship that developed with Mr. Kruger and the Craigslist posting and the Facebook posting, that is all very specifically referenced in defense counsel's sentencing memoranda to the court, which is at record 22, page 2. There are two paragraphs where counsel outlines how Ms. Feldman first met Divine Kruger, which was through work-from-home advertisements on Craigslist, and that she responded and that at first Divine had asked her to do minor tasks for small sums of money that appeared to be legitimate, like posting marketplace ads on Facebook. So to that very specific line of questioning, this is information that the court knew, and the court knew this information because Ms. Feldman and her counsel in their sentencing memorandum specifically put it before the court. Looking at first whether or not we're applying the plein air standard or the de novo review in this case, we have to think about whether or not Ms. Feldman preserved her right to appeal her Fifth Amendment claim here because she never informed the court that she wanted to invoke her Fifth Amendment right, and counsel never made a timely and specific objection. So turning to whether or not Ms. Feldman... Did there need to be an objection if the error is made at the time of sentencing? Yes, Your Honor, and I think what your question might be getting at is the Gamble, Pennington, Wood, and Wiltshire line of cases and whether or not those exception cases should apply, or whether or not our traditional objection cases would apply. And so before I get there, I would start with the fact that if Ms. Feldman had unambiguously invoked her right to remain silent, then she would have clearly satisfied the first method for preserving her error. She would have informed the court of the action that she wished to take, but that did not happen. And so then what needed to happen is counsel needed to preserve that error by making a timely and specific objection. And the reason why is that this case is so different from the Gamble, Pennington, Wood, and Wiltshire cases where we're talking about 51A and an exception. So an exception is a complaint about a judicial choice after it has been made. And when we look at Gamble, Pennington, Wood, and Wiltshire... I don't know. The government's had a hard time convincing us that we're mistaken in Wood. You've tried a bunch. I'm not trying to say that you're mistaken in Wood, Honor. That's not my argument. My argument is that in that line of cases, the issues arose during the court's explanation of its sentencing. In here, there was no explanation of the court's sentencing. There was no order that the court had given at the time that it's engaging in this discussion. I mean, I'm reading right from the transcript. She's asked a question and she says, I'm going to decline to answer. And the district court says, decline to make any statement. The defendant says, correct. And you've discussed this with your counsel? Correct. And what do you want her to say? I want her words to be more specific in this context. You want the defendant to reference the Fifth Amendment? No, Your Honor. That's not my argument, Your Honor. What I want is for Ms. Feldman to unambiguously invoke her right to remain silent, and we determine whether or not she's done that. You're going to decline to make any statement? You might want to move on. This is in the context... I'll just briefly make one point on this then, because we're at sentencing and we're in the context of allocution. And what that means is the court is required to address her, ask her if she wants to speak. The court is required to consider her mitigation. The court is required to weigh the 3553A factors. And so when Ms. Feldman tells the court what she does here... She tells the court, I'm going to decline to answer. Yes. In the context of being invited to allocate. You wouldn't believe the number of arguments we've had since 2022 where we tell the government we meant what we said and would. And again, I take no issue with would. You might want to move on. Okay. I understood, Your Honor. But I would point to Johnson and Kesky's where the defendants made similar statements. They said, I don't want to... You don't need to point us to anything. We understand would. Understood. Keep going. I mean, you've got a pretty good position. You've briefed on the merits. Yep. And I don't know why we see this over and over and over again, that we don't like would. And I'm not actually taking any issue with would, but I will move on. So there's no error in this case because Ms. Feldman, her testimony was neither compelled nor incriminating. And I think this is where the facts really matter. Because every... Ms. Feldman is the one who put most of the information discussed during her back and forth with the court at issue in the sentencing memorandum that she filed. The only piece of information that the court learned from its back and forth with Ms. Feldman was that she was remorseful and wanted to apologize to the victims. And that is mitigating after a defendant has already pled guilty, acknowledged their responsibility in the crime. And so... And it happened right after the one victim telephoned in or something, right? Yes, that's right, Your Honor. It was specifically after one of the victims in the case had called and spoke at sentencing. And the point of the victim statement there really was that this is not a victimless crime. And so I think that's why you see Judge Conley in this case ask that very specific question of, are you willing to at least admit that this is not a victimless crime? I mean, this is a crime that cost people real money. Absolutely. A lot of money in this case and that impacted people's abilities because... That's how it all got started. I think you're right about that. Yes. And so again, setting the one new fact, which was remorse and apology aside, everything else was known either through the PSR or through the defendant's own sentencing memorandum. And so that memorandum discussed her mental health conditions and specifically said that those conditions contributed to her involvement in the offense. And so I'm looking at the sentencing memorandum now. So the depression, all of the mental... They were listed and provided in the sentencing memorandum that she talked about with the judge? Or the PSR. So the PSR itself also specifically listed the depression and the bipolar and gave some timeframes for when those kicked in. And then the sentencing memo specifically references her mental health conditions, which were compounded by her back pain. And it lists some of her physical conditions. I don't believe the memo itself specifically identified her mental health conditions, but the PSR certainly did. It definitely identified bipolar and it definitely identified depression. Yeah. I don't think that Mr. Bugney's not focused on that because that's probably more mitigating than aggravating if it's anything. His point is about Krueger. Yes. Which is why I wanted to clarify that point first when I came up here. The memo itself is where we learn this information about how she first meets Mr. Krueger, how she becomes engaged with him at first, which is through the Facebook marketplace ads, and then how that relationship evolves over time. So in the memo, it specifically says it starts with the marketplace. And then because he starts delaying her some payment for that work, they stop communicating for a while. In the sentencing memorandum, is there a timeframe put on the relationship? There's not a specific timeframe put on the relationship, but you can tell that it is a repeated and ongoing one because looking at page two of record 22, it says that Mr. Krueger reaches back out to her again. And that's when she discloses to him how financially desperate they are. That's when the memo says that he offers her another opportunity to earn money, including receiving the unemployment benefits. And that's really when she starts back up with him in this new debit card scheme. And so it's really this memo by Spellman's own counsel that puts this relationship and the length of this relationship at issue. And to your point, to your honor's point earlier, I do think that if we look at the statement of reasons the court offers, it is clear that that is why the court is picking 16 months over the 14 months, which it had said already even before anyone spoke that it was skeptical it could get to the 14. And so I'm at that last sentence in the statement of reasons, given the defendant's repeated participation in illegal activities with Devine Krueger and her repeatedly deciding to continue to participate in this behavior, a 16 month sentence is appropriate. And that information right there, we get that exactly from her counsel's sentencing memo. Yeah, the question to my, you can correct me if I'm wrong, or I think the question he was asking the district court that is, was largely what motivated you to engage in fraud like this? Yes, and I think she answers that in her memo as well. When she says that they're financially desperate, they've been living, I think it was with the brother-in-law or with some family member. And in particular during the pandemic, they just needed help to cover some basic living expenses. So again, that's all information that we learned from the memo itself. And I'd ask this court to affirm. Thank you. Okay, very well, Mr. Remington, thanks to you. Mr. Buggy, go right ahead. Sorry. Your honors, I think that it's a whole different ballgame hearing it from your counsel from hearing it from the client. And it's also the client's right to keep that. Now, there's a second assessment that has to be done here. It's not just- Hold on. Her point is that, I think her point is that the defendant through counsel put all this in play by putting this in the memo. And I don't believe it's all in the, I understand we have allusions to it. It's that the judge is able to then question that. If all of this is already out there, then why ask her any questions? Why do you go and probe deeper to what you- Yeah, I think the question that I'm trying to get to is that this notion that the Fifth Amendment was violated because there were incriminating statements brought out. If we accept that she said, I don't want to speak and that there were incriminating statements brought out as a result of the judge continuing to question. And so, before he asks anything, he says it should be just, this defendant seems to have a longer term relationship with the so-called Mr. Krueger, right? And so, in the sentencing memorandum, she explains that there was a marketplace, there was a business relationship. He goes away for a while and then he comes back. And so, the judge is already aware that there is a longer term relationship. And I don't believe that, and I can see the precision of your question. The fact that someone is aware of something, eliciting it again or eliciting it to a greater degree doesn't mean that it doesn't, it's not incriminating. It's not something that doesn't change that. I would also go so far as to say this, when you think of it in this context of sentencing, it's also that you're revealing things about the client. It's not just the mere fact, right? It's not just, you know, I met on this date, on April 15th, whatever. That's incriminating. But the judge is now going into the demeanor of the defendant, the lack of remorse and everything else. And you can actually go and look at that and say, I want to hide that. Maybe I don't actually feel sorry for everything or maybe I'm incapable of expressing all of that. That's what the Fifth Amendment allows the person to hide, to say, I don't, I'm shielding from you everything else that you may want to know. I don't want to prolong this. I got this question for you. This rule is what trouble, I know I'm a broken record on this. Suppose at a guilty plea, a district judge says, do you wish to plead guilty or maintain your not guilty plea? And the defendant says, I want to plead guilty. And then the district court, as you often see happen, says, well, tell me in your own words what you did to commit the crime. And the defendant says, I'm taking the Fifth. I don't think you can accept the guilty plea. Okay. Once the defendant articulates some basis, right, a factual basis is established to accept the plea under Rule 11, all that. Okay. So much of this seems waived. So if the defendant says, I'm not trying to get into the particulars of this case. You know, I got recruited to sell bags of heroin on the corner. I was financially desperate, you know, et cetera, et cetera, et cetera. And then some aspect of the, well, how often were you working on the corner comes up at sentencing. It's just hard for me to see that as incriminating. Flip the hypo. All right. Let's just say, you know, yeah, I had a gun, you know, on the, on the street corner and I was also selling drugs and everything. All right. And then he gets charged in state court. And what do they use? They use a transcript to say, you know, you were on the corner and we saw you, you know, Mr. Green walked up and you gave him something. Well, we know your honor, because we have his statement sworn before a federal judge when he took the plea that he was doing something else. So he was dealing drugs. That's direct evidence of that. And usually the federal is the hammer, right? That's the 300 months that carjacker got. That's going to stop you in your tracks. But there are times where criminal defense attorneys say, judge, I have to limit this colloquy because I have a heroin causing death or I have some other aspect that I'm very careful for. I hear you on that. I mean, it's a hard, it's a hard area. That's why I focused on the rule. So, okay. Mr. Bugney, thanks to you. Thank you very much. Really appreciate it. Mr. Remington, thanks as well to you. Appreciate it very much. We'll take the appeal under advice.